GEORGE L. PRESTON, Appellant, *vs.* EFFIE PRESTON LLOYD *et al.* Appellees.

*Opinion filed June 24, 1915—Appellant's petition for rehearing dismissed on his motion October 8, 1915.*

1. EVIDENCE—*complainant has burden of proof on filing bill to set aside deed.* One who files a bill to set aside a deed upon the ground that its execution was procured by undue influence and that there had never been a valid delivery of the deed has the burden of proving the allegations of his bill.

2. UNDUE INFLUENCE—*what is not undue influence.* The fact that a daughter, by appealing to the affections and sense of justice of her aged father, who was about to marry a young woman whom the daughter did not know, induced him to make a deed to her, reserving a life estate in himself, in accordance with his long declared intention that the land should belong to his daughter and her children, does not constitute undue influence.

3. DEEDS—*transactions occurring after delivery of deed do not affect the validity of the delivery.* If a deed has been delivered to the grantee without any condition of which she is aware or which she has authorized, the validity of such delivery is not affected by conversations or transactions subsequently taking place between the grantor and third persons.

4. APPEALS AND ERRORS—*when Supreme Court will not disturb the chancellor's findings.* Where the evidence in a chancery case

heard by the chancellor in open court is in irreconcilable conflict and so evenly balanced on the important features that the decision of the case must depend wholly upon which witness or group of witnesses is to be believed, the Supreme Court will not disturb the chancellor's findings as to the facts.

CARTER, DUNN and COOKE, JJ., dissenting.

APPEAL from the Circuit Court of DeKalb county; the Hon. MAZZINI SLUSSER, Judge, presiding.

BULKLEY, GRAY & MORE, and H. S. EARLY, for appellant.

CHILTON P. WILSON, and CLIFFE & CLIFFE, for appellees.

Mr. JUSTICE WATSON delivered the opinion of the court:

Appellant filed his bill in the circuit court of DeKalb county on February 24, 1913, to set aside a deed which he had made on the 13th day of that month conveying to his daughter, Effie Preston Lloyd, appellee, his farm of 220 acres, upon the ground of undue influence exercised to procure the execution of the deed and the further ground of non-delivery of the deed. Both Mrs. Lloyd and her husband were made defendants to the bill, and a temporary injunction was prayed for and issued, restraining them from conveying or encumbering the farm until the issues should be heard and determined. Answer was filed by appellees, issues were joined and the cause was tried by the chancellor upon the testimony of the witnesses produced, sworn and examined in open court. The proofs were heard on October 11, 27 and 28, 1913, and January 10, 1914. The cause was decided May 21, 1914, the equities found to be with appellees, and a decree was entered dismissing the bill for want of equity. On that day, by leave of court, an amendment was filed to the bill alleging a condition precedent to the delivery of the deed, to-wit, that a provision

of $400 per annum to be paid to his intended wife after his death, out of the proceeds of the farm, should be agreed to and arranged for, and that prior to delivery of the deed the grantor should see his fiancé and ascertain whether or not she would agree to the proposed settlement.

The evidence shows that George L. Preston, appellant, an old citizen of DeKalb county, had lost his wife when he was about seventy-five years of age, some two or three years before the happening of the events now in controversy. She had been an invalid for twenty years or more and had received loving care and attention from her husband and from their only child, Effie Preston Lloyd. Mrs. Lloyd, with her husband and three children, the eldest a boy of twelve, lived in Chicago. Preston had been very fond of his daughter during all of her life and had given her every advantage of education and culture within his power. He was also much attached to her children, particularly to Charles Herbert, the boy above mentioned. He had frequently during the years preceding the execution of the deed described in his bill, expressed his purpose to give the farm in question to his daughter and through her to her children. Shortly before February 12, 1913, he entered into an engagement to marry Eleanor Maude Touche, informing her fully and correctly as to his ownership of the farm in question as well as a comfortable residence property in Sycamore and some personal property, and on that day he informed his daughter, by letter, of his intended marriage to Miss Touche, and invited her and her family to attend the wedding on February 17, 1913. Mrs. and Mr. Lloyd, with the boy, Charles Herbert, went at once to Sycamore, to the house of her father, for the purpose of securing further information concerning the proposed marriage and about her father's fiancé, whom they did not know, and for the purpose of inducing her father to convey to her the title to the farm prior to the marriage. On the evening of that day the subjects mentioned were

talked over by the Lloyds and Preston at much length. Mrs. Lloyd asked her father to convey the farm to her, saying he had always said she and her children were to have the farm; and unless he should make the conveyance she feared she would get none of his estate. She reminded him he was growing old, that some members of his family had suffered mental derangement in old age, and she was afraid the farm would be gotten away from him. She told him she knew he wanted to do right and she felt now was the time to arrange those matters. Preston said he was willing to make a will giving her the farm, but both Mr. and Mrs. Lloyd objected to that as being subject to revocation. The boy also pleaded with his grandfather to make the deed. Preston expressed no objection to their ultimate ownership of the farm, but said he thought he ought to talk it over with his intended wife. On the following morning, and after a comparatively sleepless night, Preston and Lloyd went together to the office of George Brown, a lawyer, who for many years had been the friend and at times the legal adviser of Preston, having arranged with Mrs. Lloyd to come there in the event she should be needed and sent for. The matter of making the deed was discussed by Preston, Brown and Lloyd at great length during the several hours of the forenoon, on the basis of a conveyance of the fee of the farm to Mrs. Lloyd with a reservation of the use and control of the farm for life to Preston. Brown then and later strongly advised against the conveyance in any form. Preston and Lloyd returned to the Preston home at noon, there had dinner with Mrs. Lloyd, and afterwards did some trifling work about the place. Then they returned to Brown's office and spent the remainder of the afternoon in further discussion of the proposed conveyance. On that occasion Brown completed a pencil memorandum of the deed to be drawn, which had been begun in the forenoon, and of a paper to be shown to and signed by Miss Touche informing her of the trans-

action and inducing her consent thereto, which paper is variously designated a "notice" or a "consent," and is as follows:

"Whereas, a marriage is about to be solemnized between George L. Preston, of the city of Sycamore, in the county of DeKalb and State of Illinois, of the one part, and Elinor Touche, of the city of Oak Park, in the county of Cook and State of Illinois, of the other part; and whereas, it has heretofore been the desire and intention of the said George L. Preston to convey and transfer certain real estate to his daughter, Effie Preston Lloyd, it being a farm consisting of about 220 acres situated on sections 32 and 31 in the township of Genoa, in said county of DeKalb, Illinois; and whereas, he having conveyed the said real estate, by deed, to the said Effie Preston Lloyd:

"Now, therefore, be it known that the said George L. Preston has, prior to the said contemplated marriage, informed and duly notified me of the fact that he had made and delivered a deed conveying and transferring said real estate to said Effie Preston Lloyd, and I acknowledge that the same has been done with my knowledge, consent and approval.

"Dated this ............ day of February, 1913."

The proof is not very clear as to the precise time when the deed and notice, in the final draft, were completed, but it was late in the day, and it became necessary for Preston and Lloyd to return to Brown's office in the evening. They had supper at home with Mrs. Lloyd and returned to Brown's office, where Preston signed the deed and acknowledged it before Brown as a notary public. The deed is a statutory warranty deed, made in consideration of one dollar and natural love and affection, correctly describing the land, and it contains the following added paragraph immediately following the description of the conveyed premises, viz.:

"Excepting and reserving from this conveyance to the said grantor, George L. Preston, for and during the term of his natural life, the exclusive, complete and entire possession, occupation, management, control, use, income, rents, issues, profits, accumulations and accretions of each, every part and all of the said real estate and premises herein above described; also the right to cut and remove from

said real estate and premises any and all trees and timber thereon or that may hereafter grow thereon, for any and all uses that he may elect; the further right to lease, let and sub-let, and from time to time lease, rent the whole or any part of said real estate and premises; the right to set and plant other trees, vines or shrubbery thereon, and the right from time to time to alter or change the buildings, fences, erect new buildings and fences, and to make any and all other improvements thereon and to do and perform any other work on any portion of said real estate that he, as grantor, desires to have done, by himself or by others under him, the same as though this conveyance were not made. Grantor agrees to pay the taxes on said real estate and keep the buildings thereon properly insured during said term."

After executing and acknowledging the deed Preston declined to receive the dollar mentioned as part of its consideration and laid the deed on a desk near him. He rose to put on his overcoat, and in his presence and with his knowledge Lloyd took up the deed and put it in his pocket. Then, or previously, Preston handed him the abstract of title, from which Brown had copied the description of the land, and upon leaving the law office Lloyd borrowed an old atlas from Brown, in order that by inspection of the county map therein he and his wife might satisfy themselves as to the correctness of the land description in the deed. At the Preston home on that night Lloyd took the deed from his pocket and Preston took the abstract from his pocket. They and the map were compared and much further conversation about the business in hand ensued. It is impossible to reconcile the testimony of the three persons present as to what then occurred. Mrs. and Mr. Lloyd testify that Preston handed over the abstract and informed his daughter that the deed, then in her husband's hands, was a nice little present for her. She complained that her husband had not had the deed recorded, and he

explained that the recorder's office closed at five o'clock in the afternoon and he would have it recorded the next morning. These statements, if true, show clearly a delivery of the deed at that time by the grantor to the grantee, regardless of whether it had been delivered at Brown's office to Lloyd. But Preston denies the action and statement attributed to him, and says the conversation about recording the deed was in a low tone between the husband and wife and not intended for him to hear, although he heard it. He says he protested he had never voluntarily parted with the deed, informing them they had no right to its possession, ought not to have it recorded, and should return it to him to keep until he should on the next day inform Miss Touche about it and secure her consent to it. On the next morning Lloyd had the deed recorded, and on the five o'clock train that afternoon, by pre-arrangement, the three went to Chicago on the way to the home of a relative in Oak Park, where they were to meet Miss Touche and her brother and brother-in-law and there explain what had been done and secure the consent of Miss Touche. Mrs. Lloyd, however, went on home,—to look after her small children, she says,—and Preston and Lloyd attended the meeting. The "notice" or "consent" was not signed by Miss Touche, and there is a sharp conflict as to what was said by the various persons who participated in the interview. Since nothing then said can legally affect the occurrences of the day before it would serve no useful purpose here to set forth in detail the various statements made, but Lloyd there maintained the deed had been on the previous day voluntarily executed and delivered by Preston, while the latter vehemently denied the statement and with some heat and violence accused Lloyd of unfair dealing. He also then insisted the deed was to be delivered only after the consent of Miss Touche thereto was obtained. In this meeting the brother and brother-in-law of Miss Touche made some criticism of Preston, holding that by the res-

ervation in the deed he had provided for himself but had not provided sufficiently well for his intended wife. They suggested the Sycamore home would not bring her any income after his death if occupied by her as a home, and that some arrangement should be made whereby Mrs. Lloyd should pay her a portion of the income from the farm after his death. Conversation upon the various aspects of the business continued among varying groups of those assembled until near midnight, when Preston and Lloyd went to the home of Mrs. Lloyd, in Rogers Park. The next morning the three talked over what had taken place in Oak Park, and Preston asked his daughter to agree to pay to Miss Touche, after his death, a portion of the income from the farm and "to do anything to satisfy her." Mr. and Mrs. Lloyd then arranged a meeting with Miss Touche's brother and brother-in-law at one o'clock on that day at the office where Lloyd was employed. Those present at the meeting were the Lloyds, Touche, Addenbrooke, and Gray, the manager of the office. Those representing Miss Touche endeavored to induce Mrs. Lloyd to agree to pay her, annually, a portion of the farm income after the death of Preston, which she declined to agree to, and no other subject was there discussed and no charge made that Mrs. Lloyd did not own the land or come fairly by its ownership. Friendly relations between Preston and his daughter and her family were then terminated and have never been resumed. His wedding was postponed, and it occurred on February 27, 1913, three days after the bill was filed.

We have in this opinion referred to the irreconcilable nature of the testimony of the witnesses upon some of the important phases of the case. It is not improper to add that upon every disputed question the testimony of the witnesses is squarely contradictory and antagonistic, according to the bias or interest of the respective witnesses, except in one instance, viz., if there was a condition precedent to the delivery of the deed resulting from the conversations in

Brown's office, to the effect a third instrument should be prepared and executed by Mrs. Lloyd by which she should agree to pay a stipulated sum or a portion of the farm income, annually, after her father's death, to his widow, such condition was never made known to Mrs. Lloyd and no witness testified she had knowledge of it. According to her evidence, which upon this point is uncontradicted, the first she knew of such a condition being contended for was in the trial of the cause. It was not disclosed, even by the bill, prior to the amendment of May 21, 1914. The usual conflict of evidence is found concerning the condition precedent. Both Preston and Brown testify it was contended for at Brown's office by Preston and agreed to by Lloyd, so far as he had power to agree, but it is shown neither of them ever made such claim, within the knowledge of the appellees, prior to their giving testimony in the cause, and Lloyd denies it.

Answering the contention that Brown is a disinterested witness, it is shown by appellees that he for many years was the personal friend and legal adviser of Preston; that he strongly advised against the making of a deed; that he and one of the counsel of record for Preston occupy adjoining rooms in the same suite of offices, using the reception and library rooms in common; that he was consulted in the preparation of the bill, at least as to the evidentiary facts within his knowledge; and that he was contradicted by Preston himself, as well as by circumstances in proof, in his statement that he was to prepare the alleged agreement for Mrs. Lloyd to sign. Preston says it was to be prepared at Oak Park after Miss Touche should sign the "consent," and no memorandum for its preparation was written by Brown.

The credibility of witnesses is usually determined by the consideration of the court or jury before whom they appear, and courts of last resort are loath to interfere with the result as determined in the trial forum. (*Lines v.*

*Willey,* 253 Ill. 440; *McCormick* v. *Miller,* 102. id. 208.)
In the instant case we are inclined to follow the above
mentioned rule, the more especially as upon most of the
important questions in the case the evidence is not only
contradictory but is fairly evenly balanced, the result de-
pending wholly upon which witness, or pair of witnesses
or group of witnesses is believed. If numbers alone are
to prevail, it may be said the preponderance as to occur-
rences in Brown's office is against Lloyd, both upon the
question of voluntary delivery of the deed and the con-
dition precedent; if, however, his statements as to those
matters are considered in the light of all the facts and cir-
cumstances in proof there is no preponderance against him.

Again, if numbers are to prevail, the evidence of in-
tentional, voluntary delivery of the deed, without condi-
tions, by Preston to Mrs. Lloyd at his residence on the
night of its execution is overwhelming. Against his de-
nial of such delivery we find in the record the below quoted
testimony of Lloyd, corroborated by his wife in substantial
detail: "We went down to the house and took off our
wraps and Mr. Preston says, 'Come out into the kitchen;
I want to smoke.' We all went out there. Mrs. Lloyd sat
at the side of the table, which had been pulled from the
wall. I took the deed out of my pocket and Mr. Preston
took the abstract out of his pocket and laid it on the table.
We checked up the description of the property according
to the new deed, with the atlas and with the old abstract,
and during the time that we was doing that,—I was not
familiar with the description of the property,—I asked
Father Preston about the different descriptions, and I re-
member well that I asked him about one piece, and he said,
'Well, that is a little narrow strip that is west of the Ge-
noa road.' There was a description of a triangular piece;
'that is Charles Herbert's alfalfa patch,'—meaning my
son. The description of the property was gone over and
checked and we believed them to be correct. Then came

269 — 11

a little further along in this deed the life-lease clause, and my wife started to read it and Mr. Preston asked her to read it more distinctly; that he could never hear her,— just as it was to-day. He can't hear very well and her voice does not penetrate very far, and so she started to read again, and he says, 'Let me read it—you mumble so,' and he got up. She handed him the deed and he stood under the gas jet and attempted to read it. His eyes are not very good and he could not read it, and so his daughter,— he handed it back to his daughter and asked her to read it, 'but read it slowly and distinctly,' which she did. After she read it he says, 'I guess that is all right.' Then my wife picked up this abstract that we had been looking at, and said, 'Why, there is something that I am much interested in; I have never seen it yet, papa.' 'Why,' he says, 'that is funny; it has always been right here in the safe.' The deed and the abstract and the atlas were all laid down upon the kitchen table, and it was becoming late and we thought we had better retire. Mr. Preston, as I remember it, got up, went to the closet, which is in front of the stove, and hung up his coat, as was his wont, and returned to the edge of the table and said, 'There is that abstract and deed; take good care of it; that is a mighty nice present.' My wife expressed herself in a way and I also said, 'Father, I appreciate very much the way that you have taken care of your daughter.' I then picked up the deed and the abstract and handed them to my wife, who happened to be standing right next to me there, and I told her to put them up. That was all that was said that evening, except he made the remark which he had made a time or two before, that he was glad he had done it,—'now the lawyers won't get a finger in the pie.' "

The chancellor before whom the case at bar was heard has held court for many years in the circuit and county of the trial. In all probability he knew the parties and witnesses personally, and at all events he must have been

familiar with such of the surroundings and conditions as would qualify him in more than the ordinary degree to determine the credibility of the witnesses and the probable accuracy, or lack of it, of the statements made by each. There is no serious controversy,—if, indeed, there is any controversy,—over the law applicable to the case, and we quote with approval what we said upon this subject in *Columbia Theatre Co.* v. *Adsit,* 211 Ill. 122: "The chancellor who entered the decree in this case saw and heard the witnesses who testified for the respective parties. The testimony of the several witnesses was conflicting and covered a wide range, as testimony usually does in similar cases, and he was in much better position than this or any other appellate tribunal to judge of the weight that should be given to the testimony of the respective witnesses. * * * The rule in chancery practice in this State is too firmly established to be now shaken or overturned, that when the chancellor sees the witnesses and hears them testify, and their evidence is conflicting, the decree entered by him will not be disturbed upon a question of fact by an appellate tribunal unless it appears that the findings of facts are clearly and palpably wrong."

We cannot say the findings of the chancellor upon the questions of delivery of the deed and condition precedent were so manifestly against the weight and preponderance of the evidence as to require a reversal of the decree, but, on the contrary, we are inclined to the opinion they are in accordance with a sound view of the preponderance of the credible evidence bearing upon those questions.

Upon the issue of undue influence in procuring the execution and delivery of the deed, chiefly relied upon as the bill stood before amendment, we think appellant has not made such proof as would justify setting aside and vacating the deed. Mrs. Lloyd prudently consulted legal counsel and a physician, after receiving notice of the proposed marriage of her father at the age of seventy-seven years,

with a view of protecting the rights of himself and of herself and family in his property through a conservatorship, if the same should appear necessary. He knew of this, but her appeal to him to put in writing his promises to her concerning the farm appears to have been made through his affections and his sense of justice, and this is not wrongful and is not undue influence, as we held in *Burt v. Quisenberry,* 132 Ill. 385, *Dickie v. Carter,* 42 id. 376, *Francis v. Wilkinson,* 147 id. 370, and *Sargent v. Roberts,* 265 id. 210. Appellant assumed the burden of proof, and to sustain his bill was required to· show undue influence or non-delivery of the deed by a clear preponderance of the evidence, and this we hold he failed to do. *Kaenders v. Montague,* 180 Ill. 300; *Valter v. Blavka,* 195 id. 610; *Thompson v. Calhoun,* 216 id. 161.

Finding no error in the decree of the circuit court requiring its reversal, the decree is affirmed.

*Decree affirmed.*

CARTER, DUNN and COOKE, JJ., dissenting.