(No. 12025.—Reversed in part and remanded.)
WILLIAM CARTER, Appellee, *vs.* ANGELINA CARTER *et al.*
Appellants.

*Opinion filed April 17, 1918.*

1. FRAUD—*burden of proof is on party alleging fraud.* Fraud cannot always be established by direct and positive evidence, but, as all transactions are presumed to be fair and honest until the contrary is proved, the burden is upon the party alleging fraud to establish its existence by clear and convincing evidence.

2. SAME—*when a court of review will reverse decree finding fraud.* A decree setting aside a deed and mortgage on the ground of fraud must be reversed where there is no evidence tending to justify the conclusion that there was any fraud in connection with the mortgage or that it was not given to secure a *bona fide* loan.

3. EQUITY—*when a decree may affect title to land in another State.* A decree of a court of one State cannot directly affect land in another State, but a court of equity, through its power to act *in personam* upon the parties to the litigation, may enter a decree which may ultimately and indirectly affect the title to such land.

APPEAL from the Circuit Court of Effingham county; the Hon. WILLIAM B. WRIGHT, Judge, presiding.

CRAIG & KINZEL, for appellants.

G. F. TAYLOR, and W. S. HOLMES, for appellee.

Mr. CHIEF JUSTICE CARTER delivered the opinion of the court:

Appellee, William Carter, filed a bill for divorce against his wife, Angelina Carter, in February, 1916, in the circuit court of Effingham county. Later this bill was dismissed by complainant, and thereafter, on his motion, the order of dismissal was set aside and an amended bill for divorce and injunction was filed and appellant Dain Attewell was made a party to the suit. Issues of fact were submitted for trial and a jury found in favor of complainant. Motion for a new trial was overruled and decree entered in accord-

ance with the verdict of the jury, finding that appellee was entitled to a divorce, setting aside a deed made by appellee to Attewell in February, 1916, and decreeing that certain real estate in Effingham county, Illinois, was the property of the appellee free of any incumbrance, and finding that a $2000 mortgage made by Carter and his wife to Attewell was fraudulent and void and setting said mortgage aside. From that decree an appeal was perfected to this court.

The amended bill alleged desertion, also the joint owner-ship of a 40-acre farm in Effingham county and joint own-ership of approximately 100 acres of farm land in Iowa. The cause was heard on the amended bill and answers.

It appears from the evidence in the record that William Carter and Angelina Carter were married some thirty-eight years before the hearing, in England, and that within ten years eight children were born to them. After they were married Carter for some time traded and sold ponies and would go out and sell earthenware at times. The allega-tions in the bill and his testimony are to the effect that while they remained in England he supported his family as well as was possible to be done from his earnings, in view of their position in life, while Mrs. Carter testified that he had never supported her since they were married; that while they lived in England the first ten years of their mar-ried life she worked in lace factories, being compelled to do so in order to support the family. The evidence also tends to show that some twelve years after their marriage, brothers of Mrs. Carter who were in this country sent tick-ets for a part of the family to come to America; that the husband, William Carter, did not come at that time; that Mrs. Carter and five of the children came to America, leav-ing two of the children with her relatives in England, one of the eight children having died. She testifies, as we un-derstand her evidence, that appellee refused to come with her. He claims that she ran away with the children and left him in England. She testified she went back to Eng-

land in about a year and brought another of the children to America; that the other remained there nine years, when she went back after him, and that her husband came from Manchester, where he was then staying, to see her; that she paid his passage to America and brought him and the remaining child back with her. She also testified that she was assisted, when she left the first time, in paying part of her expenses and bills by the public authorities in England and the curate; that during the nine years she was in this country before her husband came here she took care of all the children, including those that were with her and the two left in England, with some assistance from her brothers; that during those nine years the husband did not contribute anything towards her support or that of any of the children; that she learned during those nine years to take care of herself and had saved some money; that when her husband came with her to this country they went to Rock Island, Illinois, the first winter, and there lost three of the children in one month in an epidemic of typhoid fever; that the expenses incident to the sickness and death of these children amounted to $1200, all of which she herself paid; that her husband did not pay a cent toward any of these expenses; that when she was here on her first trip from England, and after she brought her husband over with her, she made money by traveling about attending fairs, telling fortunes and reading palms; that after her husband came she gave him money to buy horses to trade and sell; that his main business both in England and America was trading horses, and that during all these years he drank heavily and frequently abused her, not only physically but by calling her names and using vile epithets towards her. For years after they came to America it seems they were traveling about together, taking their children with them and living somewhat of a gypsy life, she telling fortunes and he trading horses. He testified that he made money out of his horse trading business, but that as he was not a scholar and his

wife was quite well educated he gave his savings to her from time to time and she deposited them in banks in the towns where they stopped in their travels; that he gave her as much as $300 at one time and $400 at another time. Mrs. Carter testified positively that he never saved any money and never gave her $300 or $400, or any appreciable amount, at any time after they came to America, and what he did give her was the return of borrowed money; that while it was true she deposited money in various banks in towns to which they came during their travels, she had earned the money herself.

The testimony of both Mr. and Mrs. Carter is in accord that on the advice of Mrs. Carter's brother they negotiated the purchase, in 1907, of the 40-acre farm in Effingham county. Mrs. Carter went to that county and purchased the land from Mrs. Homann for $2200, of which amount she paid $1200 in cash. She testified that $700 or $800 of this amount was money she had received a short time before from her father's estate in England and the remainder was money which she claimed she made in America. Notes were given for the balance of the purchase price. The deed for this land was taken in the name of Mrs. Carter. Appellee testified he understood the land was to be taken jointly in both their names and that some of his money went into the purchase of the land. A banker in Effingham county who assisted in closing up the transaction between Mrs. Carter and Mrs. Homann testified as to the purchase of this land, and his testimony tends to support that of Mrs. Carter as to who furnished this money. This farm was rented for two years to tenants and then the Carter family moved on and farmed it for themselves. Three years later Mrs. Carter negotiated the purchase of about 100 acres near Rubio, Iowa, for $10,000 and took the deed in her own name, paying $6500 in cash and giving back a mortgage to secure the balance of $3500. She testified that she obtained the $6500 in cash by using money that she had

saved herself, by borrowing $1500 of her son Joseph, and by borrowing $2000 of her son-in-law, Dain Attewell. The $2000 borrowed from Attewell was secured by a note and mortgage given on the 40-acre Effingham farm, the mortgage being signed by both William and Angelina Carter. Appellee claims that a part of the money used to purchase the Iowa land was his earnings which he turned over to his wife. Mrs. Carter denies emphatically that her husband gave her any money which she used in the purchase of the Iowa farm. After purchasing the Iowa farm Mrs. Carter and the children moved onto it, taking most, if not all, of the personal property and stock from the Effingham farm. The evidence shows quite clearly that at the time they left the house Carter was under the influence of liquor. There is a conflict of evidence as to whether Mrs. Carter and her son Joseph were not partially, at least, responsible for Carter drinking so heavily at that time. They deny emphatically that they were, but the testimony of one of the neighbors tends to show that Mrs. Carter asked him to go in and drink with her husband and assist in getting him intoxicated. Shortly after the wife and children left the Effingham farm with the household furniture and personal property Carter followed them on the train and went to the Iowa farm, where he stayed with them for the greater part of a year. He testified he was compelled to leave there on account of the cruelty of his son Joseph and the actions of his wife, who, he says, told him that she wanted him to go back to the Effingham farm if he wanted to, and stay there. He testified that before he went back there he told the tenant that he could not have the farm for another year and reported this to his wife and told her he was going back. She admits having a conversation with him to the effect that he had told the tenant he could not stay another year and that he (appellee) was going back, but testified that she did not urge him to go but told him he could stay and live with them as long as he wanted to. They both

agree that he took a horse and went to the nearest town and sold it, and with the money thus obtained and some other money that he had, went back to the Effingham farm and stayed there until this litigation, but the wife claims that the horse he took belonged to her, and that he took other money as well as that received from the sale of the horse, which did not belong to him. The testimony of the son Joseph, and of his wife, tended to support that of Mrs. Carter with reference to the reason for Carter leaving the Iowa farm.

In February, 1916, Dain Attewell, the son-in-law, came to Effingham county to see his father-in-law with reference to paying the $2000 mortgage that Attewell held on the farm, which was past due. Attewell testified that nothing had been paid on it, either interest or principal, since it was given, except $100; that he stated to his father-in-law that if the mortgage was not paid he would have to foreclose it, and that then Carter asked him how much it would cost to foreclose the mortgage and he told him about $100, and that his father-in-law later told him he would save him that amount of money by deeding the land to him if his wife would join in the deed. As the result of their talk they both went to an attorney, Jacob Zimmerman, in Effingham, Illinois, and a deed conveying the 40 acres to Attewell was drawn, and also a contract, which Attewell signed, agreeing that the Carters could keep possession of the land until March 11, 1917, and that Mrs. Carter could have the opportunity and right to redeem the land, if she desired to do so, at any time by paying the $2000 and the interest thereon. This deed was signed and acknowledged first by Carter and later by his wife, to whom word was sent by the son-in-law to come for that purpose, and the contract was signed and acknowledged by Attewell. During the conversation with reference to deeding this land to Attewell, Carter told his son-in-law that he had filed a bill for divorce against his wife in the circuit court of that

county. Attewell advised him not to push that suit; that they had separated before and gotten together again, and he saw no reason why they should not be able to live together longer if Carter wanted to do so. Carter testified on this point that he was induced to sign this deed with the understanding that Attewell would persuade his wife to come back to live with him. Attewell denies this, stating that the proposition to deed the land was made by Carter to him and was not brought about by any urging on his part; that it was true he told his father-in-law he did not think he ought to go ahead with the suit for divorce as he thought they would be able to live together again if Carter wished, but the settlement of the divorce proceedings was in no way a part of the conveyance of the land to him; that such conveyance was an entirely separate and distinct transaction and was made to save the cost of foreclosing the mortgage. The testimony of Mrs. Carter and of attorney Zimmerman, and one or two others who heard some talk between Attewell and Carter with reference to this transaction, tends, in our judgment, to support Attewell's testimony as to this transaction.

The evidence of some of the neighbors who lived near the Effingham farm was taken, and that of some of the officials in Effingham, in that county, as to the habits of Carter and of his wife. We think the great weight of evidence in this record on this point is to the effect that both Carter and his wife drank intoxicating liquors and that Carter was often intoxicated, although there is some evidence tending to show that during one or two years of the time they lived on the farm he worked faithfully and carried on the farm in such a way that he could not have been frequently intoxicated during these years. Mrs. Carter herself testified that he drank less during the first and second years of their residence on the Effingham farm than he had ever done, either before or after, while she lived with him.

Carter testified, and it is suggested in the argument by his counsel, that the $2000 that was claimed to be loaned by the son-in-law, Attewell, at the time the Carters purchased the Iowa farm, was never loaned by Attewell for that purpose, and that there was no real value given by Attewell to Mrs. Carter when the mortgage was given on the Effingham farm; that this pretended mortgage and loan was the result of a fraudulent scheme entered into by Mrs. Carter, her children and Attewell for the purpose of cheating him out of the Effingham farm. Outside of Carter's testimony on this point there is not the slightest evidence in the record to justify any other conclusion than that Attewell furnished the $2000 at the time Mrs. Carter testified he did and that she used it to assist in paying for the Iowa farm. Neither is there any testimony in the record that corroborates in any way the testimony of Carter that he had saved money and gave it to his wife for safe keeping. In our judgment the great weight of the testimony in this record tends to support the claim of Mrs. Carter that she furnished the money in the way she testified to purchase both the Effingham farm and the Iowa land, and that her husband did not furnish any appreciable amount to assist in purchasing either of these farms, and that he had never done much, if anything, to help support his family. The testimony of the children who testified, and of a daughter-in-law, Mrs. Joseph Carter, and the son-in-law, Attewell, tends to support the testimony of Mrs. Carter on these points.

It is true, as argued by counsel for appellee, that in many instances fraud cannot be established by direct and positive evidence, and can only be proved by circumstances which justify the conclusion that fraud exists in a certain transaction. (*Cohen* v. *Friedman*, 259 Ill. 416.) Even conceding that appellee's testimony is true as to his connection with the mortgage on the Effingham farm and the purchase of the Iowa farm, we do not see the slightest ground, from his

testimony, for reaching the conclusion that the loan was not actually made by Attewell, the son-in-law, at the time the mortgage was given on the Effingham farm, and there are no circumstances which tend to sustain the allegation that there was fraud in connection with the giving of this mortgage. The burden of proving that fact, if it was a fact, rested upon appellee. (*Schroeder* v. *Walsh,* 120 Ill. 403.) All transactions are presumed to be fair and honest until the contrary is proved. Fraud will not be presumed but must be proved as a fact by such clear and convincing evidence as leaves the mind well satisfied that the allegations of fraud are true. (*McKennan* v. *Mickelberry,* 242 Ill. 117.) The verdict of a jury in this kind of a case, and the decree of a chancellor in accord therewith, will not be disturbed unless it is clearly shown that the evidence preponderates against the finding of the decree. We think, as already stated, the great weight of the evidence in this case is against the finding of the decree on the question of fraud. Moreover, we find not the slightest justification from anything in the record to sustain the verdict of the jury and the decree giving all of this Effingham county land to appellee. The jury found specifically that a part of the money used to purchase the Effingham county farm belonged to Mrs. Carter, and they found the same with reference to the Iowa land. The Iowa land being out of the jurisdiction of the trial court, the jury and the chancellor decided, apparently on the ground that the courts of this State had no authority to adjust the title as to the Iowa land and it already stood in the name of Mrs. Carter, that it would be equitable to give all the Effingham county farm to appellee and leave the title to the Iowa land in the name of Mrs. Carter. If the trial court could have settled the title to both of these farms in the litigation in this State then there might be some justification for such finding, but there is nothing in the decree here that in any way settles the title as to the Iowa land, and there is nothing in the decree that

will prevent appellee from filing a bill and claiming an interest in the Iowa land. In this regard there can be no question that the verdict of the jury and the decree of the court are incorrect and must be set aside.

Counsel for appellee did not allege in their bill anything affecting the title to the Iowa farm nor did the decree in any way touch that title. Counsel for appellee concede this to be true, and they argue that no doubt the court took this into consideration, and while it had no jurisdiction to vest the title to the Iowa land it had full jurisdiction over the Effingham county land and could so vest the title as would be just and equitable between the parties, at least to the extent to which the value of the Effingham county land would reach. It is necessarily true that "it is impossible for the decree of a court of one State to directly affect property in another. No State has power to interfere with the sovereign rights of a sister State." (5 Pomeroy's Eq. Jur.—3d ed.—sec. 14; *Heyer* v. *Alexander,* 108 Ill. 385.) There was no attempt made by the trial court, through the power of a court of equity to act *in personam* upon appellee or any other party to the litigation, to enter a decree affecting the title to the Iowa land, nor does the decree ultimately and indirectly affect the title to such land, as possibly might have been done under the equitable authority to give a remedy *in personam* beyond the territorial jurisdiction of this State. See 4 Pomeroy's Eq. Jur. (3d ed.) sec. 1318; also *Fall* v. *Fall,* 121 Am. St. Rep. 767; 75 Neb. 120.

There is no question that the verdict of the jury and the decree of the court are wrong in holding the mortgage of Dain Attewell illegal and void.

The decree of the circuit court, so far as it affects the property in question, must be set aside and the cause reversed for further proceedings not in conflict with the views herein expressed.   *Reversed in part and remanded.*