(No. 31239.—

JOHN ZUBAS *et al.*, Appellees, *vs.* ALEX WHITE, Appellant.

*Opinion filed November 22, 1949.*

Leonard Lundin, of Rockford, for appellant.

Edward S. Foltz, Jr., and Anthony S. Ingrassia, both of Rockford, for appellees.

Mr. Justice Fulton delivered the opinion of the court:

This is an appeal from a decree of the circuit court of Winnebago County, sitting in equity, in favor of the plaintiffs-appellees, John Zubas, Joseph Zubas, Marie Kane, Della Hirtz, Pauline Pirages, Bonita Wichunas, Madaline Turell, Anna Findley and Margaret Kane, hereinafter referred to as plaintiffs, and against the defendant-appellant, Alex White, hereinafter called defendant.

The plaintiffs are the children of one Idella White, now deceased, by a previous marriage, and the suit is brought against the second husband, Alex White, defendant, to have set aside and declared void two quitclaim deeds, dated April 10, 1943, the first from deceased and the defendant to one Ruth Eastwood, a nominal party to the suit, and by said Eastwood back to deceased and defendant, as joint tenants.

The complaint as amended alleges the ownership in fee of certain real estate in the deceased, subject to a trust deed.

It further alleges that the defendant, while the deceased was in the hospital, and by reason of an alleged existing confidential relationship, fraudulently secured the execution of the two quitclaim deeds in question. The complaint prays that the deeds should be declared fraudulent and void and the title found in the plaintiffs as heirs-at-law of the deceased, subject to the dower interest of the defendant.

The defendant by his answer denies each and every essential allegation of the complaint. On motion of the plaintiffs, the question of whether the deed from the deceased was procured by fraudulent representations of the defendant was submitted to a jury for a determination of this fact issue.

The undisputed facts presented to the jury and the chancellor at the trial show that the deceased was born in Lithuania and at the time of her death was about 68 years of age. She was a person of little schooling or education either in her mother country or in the United States and was unable to read or write English or Lithuanian and could not write her own name. While she could speak English for the purpose of simple, general everyday conversations, her family conversed with her in Lithuanian and it was necessary to explain the meaning of larger English words when conversations were had with her in English. She acquired the property in question here on November 6, 1937, and on June 14, 1941, the deceased and the defendant executed a trust deed on the property in the sum of $1200, which became due November 15, 1942. The trust deed was in default on April 10, 1943, and had not been paid. The owner of the note was a Mrs. Navitzkus.

The deceased had been in ill-health for several years and became very seriously ill four days prior to April 10, 1943. On April 9, 1943, her attending physician directed that she be confined in a hospital; she was taken

to the hospital in the afternoon of that day. The doctor had informed the defendant that her condition was such that it looked hopeless for her to recover and that the family should be notified. Accordingly, the defendant notified Pauline Pirages, one of the plaintiffs herein, who in turn notified other brothers and sisters, also plaintiffs herein, of their mother's condition. Mrs. Pirages then went to the hospital and was constantly in attendance upon her mother until her death.

The disputed facts arise from the occurrences at the hospital from April 9, 1943, to April 12, 1943, when deceased passed away. The defendant contends that upon the admission of the deceased to the hospital, deceased had pain over her liver and had abdominal distress; that in the doctor's opinion, it was evident she had had a slight cerebral hemorrhage, that her eyes were intermittently enlarged, dilated and contracted; that her tongue was a trifle larger than ordinary; that her hearing was good; that she talked to and intelligently answered questions from the doctor; that her breathing was irregular and that oxygen was used but was unnecessary. The testimony on behalf of the defendant was also to the effect that the deceased was bright, talkative, answered questions intelligently and told the doctor about her condition. All the conversations with the doctor were in English.

The testimony on behalf of the plaintiffs, supported by the hospital records, indicates that the deceased had suffered a cerebral hemorrhage with a resulting very rapid and weak pulse; that her skin was moist and her lips and face were somewhat bluish; that eyes and pupils were widely dilated and her hearing was difficult; her tongue was very large and heavily coated and she was in a condition of a slight state of coma upon admittance. The hospital describes the patient as in poor condition, with some indication of paralysis. On April 10, she was described as showing no

improvement and as being in poor condition. The report for the 10th of April shows that the breathing of the deceased was very labored and that oxygen was administered. Her condition remained approximately the same through April 11 and April 12 until her death.

The plaintiffs testified that as the various sons and daughters came to visit their mother in the hospital, the deceased did not recognize them until told who they were and then on occasion could not adjust herself to their presence. They further testified that the deceased appeared to be very ill and that she moaned and groaned and rubbed her head and had difficulty in hearing.

On behalf of the plaintiffs, it was further stated that on Saturday morning, April 10, Mrs. Pirages returned to the hospital at 6:00 o'clock in the morning and remained continuously with the deceased throughout the day. At some time during the middle of the morning, the defendant appeared, and in the presence of Mrs. Pirages told the deceased in Lithuanian that Mrs. Navitzkus, the holder of the trust-deed note, was worried about her money because deceased was ill, and told her that they would have to have the mortgage renewed and that he was going to call a lawyer for the purpose of preparing the papers which she would have to sign. The defendant left the hospital thereafter and when he returned, Joseph Zubas, one of the plaintiffs, and his wife were in the room and the defendant told them it was unnecessary for all of them to be there, and thereupon Joseph and his wife left. Joseph testified he left Mrs. Pirages in the room. Defendant then told Mrs. Pirages she had better leave, but she stated she was going to stay with her mother. Thereupon, the defendant brought his lawyer into the room with two nurses and the defendant again told the deceased in Lithuanian that the lawyer was there and she would have to sign the papers to renew the mortgage. The lawyer then told the deceased he would have to have her signature and instructed her to

make her mark on the paper. The nurses signed as witnesses and the lawyer took the paper and departed. Shortly thereafter, Mrs. Navitzkus came to the hospital and spoke to the defendant and asked if everything was taken care of and the defendant assured her that this had been done.

For the defendant, it was stated the attorney went to the hospital with the deeds. When he arrived at the hospital he explained to the doctor that he needed witnesses to the mark of deceased and two nurses were supplied. The lawyer recalled he had told deceased he had a deed to the property and that she looked at it and made her mark upon the deed. He further stated that she listened attentively and showed both expectancy and recognition; that no one in his presence told deceased that the instrument was an extension of a mortgage but that the defendant had a conversation with his wife in a foreign language which he did not understand.

The defendant was examined adversely by the plaintiffs and denied that he spoke to deceased in Lithuanian when the lawyer was present or at any other time, denied that anyone told him that deceased's death was imminent and denied that he had told Mrs. Pirages of the deceased's condition.

This evidence was presented to the jury, and the question of whether or not the execution of the quitclaim deed of April 10, 1943, was procured by the fraudulent representations of defendant was answered by the jury in the affirmative. The chancellor, in a written opinion, stated that the jury had found the facts exactly as he would have done had he heard the case as chancellor and directed the entry of a decree in conformity with the prayer of the complaint.

Defendant sets forth ten errors which he relies upon for reversal, but in his brief encloses them all in the single contention that the decree of the lower court is contrary to the law and the evidence and that the plaintiffs had

failed to prove their case and, therefore, the decree of the lower court should be reversed.

The defendant further states the law correctly to the effect that the plaintiffs, to recover, must show by clear and convincing proof that a confidential relationship existed, and, in the absence of such proof, that there was fraud in the execution, by such clear and unambiguous circumstances as to leave no doubt of such facts.

In *McCrillis* v. *Utterback*, 397 Ill. 550, the rule was set down, "The principles applying to this case are well settled. A fiduciary relationship does not obtain between a parent and a child as a matter of law. [Citing case.] The burden of proving facts from which a confidential and fiduciary relationship arises is on the party seeking to set aside the conveyance to establish the relationship. The proof must be clear, convincing and so strong as to lead to but one conclusion. [Citing cases.] It is aptly said in *Dyblie* v. *Dyblie*, 389 Ill. 326, that to prove a fiduciary relation special confidence and trust on one side and dominance and influence on the other must be shown." The chancellor here found that no fiduciary relationship existed by the mere fact that the defendant and deceased were husband and wife. On the authority of the *McCrillis case,* we also are aware of the rule of law that the deed here cannot be presumed to be the product of fraud or undue influence from the mere fact of the relationship of the parties.

The sole remaining question for this court, then, is. whether or not such fraud existed and is shown by the evidence as will justify the decree rendered by the chancellor. In *Bernstein* v. *Bernstein*, 398 Ill. 52, cited by the defendant herein, we said, "The plaintiff was the only witness. The trial court set aside the deed, but this court reversed the decree because the plaintiff was not corroborated as to what took place at the time of the execution of the deed, while the defendants were corroborated by other

witnesses. In that case we said, 'Fraud will not be presumed, but must be proved by such clear and convincing evidence that the mind is well satisfied that the charge is true. (*Carter* v. *Carter,* 283 Ill. 324; *Mosbarger* v. *Brown,* 313 Ill. 238.)'" In *Fangrow* v. *Buetow,* 399 Ill. 127, we said, "There being no fiduciary relationship, fraud will not be presumed and the burden was not on appellees to establish the fairness of the execution of the contract and deeds." The cases just cited also contain language to the effect that where a deed is duly authenticated by a notary, the rule is that to impeach the certificate of acknowledgment the evidence must be clear and convincing.

Examining the facts again as applied to the law involved in this decision, the testimony for the plaintiffs was to the effect that the defendant informed deceased that she was to sign an extension of a mortgage. These conversations are denied by the defendant. However, the lawyer testifying for the defendant stated on his direct examination that the defendant had discussed the matter in a foreign language with the deceased at the time the deeds were signed and that he did not understand the context of that conversation. Further, the defendant claims that the deceased was in a fair and intelligent condition at the time the deeds were executed. The hospital record is not in conformity with this contention, but indicates, to the contrary, that the deceased was extremely ill and in severe pain.

As the chancellor so ably pointed out in his written opinion, the deceased was illiterate, uneducated, and extremely ill; the legal effect of the two deeds had never been explained to her and the mere fact that she looked at them meant nothing because she could not read English. The chancellor found that it had never been explained to her clearly and convincingly that she was deeding her property away and that she was depriving her children of the benefit of that property. The chancellor properly took into

account the fact that the deceased was a woman who could read and write neither Lithuanian nor English. Further, the testimony of the daughter as to her presence in the hospital and the actions of the defendant are corroborated by the other plaintiffs. Under these circumstances, it would seem that there was indication of fraud which would shift the burden of the proof to the defendant herein to prove that the transaction was without the taint of fraud.

The mere fact that the deeds were acknowledged before a notary has no bearing in this case. Without an explanation to the deceased of the legal effect of the document which she was signing, the notarization and acknowledgment have no effect. There is no argument here but that the deceased made her mark upon the deed in question and that the acknowledgment was taken. The question before this court is whether or not the deceased was aware of what she was signing and whether or not the mark was obtained by fraud.

As a practical matter the question before us is whether or not the judgment entered in the trial court is manifestly against the weight of the evidence and is palpable error. The defendant admits that this is the question before us and argues that the decree of the lower court is contrary to the law and the evidence. In *Preston* v. *Lloyd,* 269 Ill. 152, we enunciated a rule long standing in our courts that "The chancellor who entered the decree in this case saw and heard the witnesses who testified for the respective parties. The testimony of the several witnesses was conflicting and covered a wide range, as testimony usually does in similar cases, and he was in much better position than this or any other appellate tribunal to judge of the weight that should be given to the testimony of the respective witnesses. * * * The rule in chancery practice in this State is too firmly established to be now shaken or overturned, that when the chancellor sees the witnesses and hears them testify, and their evidence is conflicting, the

decree entered by him will not be disturbed upon a question of fact by an appellate tribunal unless it appears that the findings of facts are clearly and palpably wrong." To same effect is the case of *Lines* v. *Willey,* 253 Ill. 440. The evidence as outlined heretofore is sufficient to show fraud. The proof on the part of the plaintiffs was corroborated by the testimony of the lawyer representing the defendant at the time as well as the other plaintiffs in the case. There is no argument as to the medical report and the doctor's testimony on the condition of the deceased. The chancellor here was aided by the findings of a jury which acted in an advisory capacity and which, with the proof before it, found that a fraud had, in fact, been committed. The chancellor, in his written opinion, stated that the jury found as he would have found had he heard the case alone on the question of fact. Under these circumstances, we cannot find that the findings of fact are palpably wrong or manifestly against the weight of the evidence. As we stated in *Chmiel* v. *Chmiel,* 399 Ill. 91, "Considerable evidence was heard, but from our examination of the record we are unable to say that the findings are against the manifest weight of the evidence or that there has been palpable error committed. It is true, much of the evidence is conflicting, but this court has many times held that the decree of the lower court will not be disturbed unless palpable error has been committed or unless the decree is against the manifest weight of the evidence. [Citing cases.]" It is to be noted that the situation here is distinguishable from the case of *Jaworski* v. *Sujewicz,* 334 Ill. 19, cited with approval in *Bernstein* v. *Bernstein,* 398 Ill. 52. In that case the plaintiff was the only witness. In the instant cause many persons testified, and corroboration for the claims of the plaintiffs herein may be found in their testimony.

For the reasons stated herein, the decree of the trial court of Winnebago County is affirmed.

*Decree affirmed.*