L. G. LINES *et al.* Appellants, *vs.* LIZZIE WILLEY *et al.* Appellees.

*Opinion filed February 23, 1912.*

1. DEEDS—*voluntary conveyances in hands of grantees are presumed to have been delivered.* Voluntary conveyances produced by the grantees after the grantor's death are presumed to have been delivered, and if delivered, the fact that the grantor retained possession of the property and received the rents during his lifetime does not re-invest him with title.

2. SAME—*deed will not be reformed in equity except upon convincing proof.* A court of equity will not reform a deed unless the alleged mistake is established by evidence which is convincing.

3. SAME—*equity will not aid party to regain title after making deed for unlawful purpose.* Where a party makes a deed for an unlawful purpose a court of equity will not aid him in regaining his title after the unlawful purpose is accomplished; and this rule applies not only to the grantor, but to those in privity with him.

4. APPEALS AND ERRORS—*when chancellor's findings will not be set aside.* The findings of the chancellor from conflicting oral testimony will not be disturbed by a court of review unless they are palpably against the weight of the evidence.

5. WITNESSES—*when husband of grantee cannot testify to conversations with grantor.* In a proceeding by heirs to set aside or reform certain deeds made by their ancestor, the husband of one of the grantees is incompetent to testify to conversations with the grantor tending to sustain the deeds.

APPEAL from the Circuit Court of Wayne county; the Hon. E. E. NEWLIN, Judge, presiding.

KRAMER, KRAMER & CAMPBELL, and S. E. QUINDRY, for appellants.

THOMAS H. CREIGHTON, for appellees.

Mr. CHIEF JUSTICE CARTER delivered the opinion of the court:

This is a bill in equity filed in the circuit court of Wayne county asking to have certain deeds canceled and held void as against appellants. The bill contains an alternative prayer that if appellants are not entitled to have the deeds canceled and set aside, two of said deeds shall be re-formed and corrected so as to convey six instead of eighty acres. This is the second time this case has been to this court. On the first hearing a decree had been entered in the circuit court dismissing the bill for want of equity. (*Emmerson v. Merritt,* 249 Ill. 538.) It was reversed and remanded for the reason that the executor under the will, with power to sell, was the complainant instead of certain other persons who would own the real estate in case the relief prayed for was granted. On the case being re-docketed in the circuit court proper parties were added as suggested in this court's decision, issues were joined, and on a hearing before a different chancellor the bill was again dismissed for want of equity. This appeal followed.

The record shows that William Lines was a farmer owning about four hundred acres of land, a part of which (where he resided) was situated in Edwards county, and the eighty-acre tract in issue was on the bottoms of the Little Wabash river, in the adjoining county of Wayne. The two deeds in question are dated March 13, 1897. One of them set forth that William and Mary Lines, his wife, conveyed to Lizzie Merritt and "Haty" Lines "the undi-

vided one half of the north-half of the northwest quarter of Section 14 forteen town too 2 South Range 9 East 4 fore acres in the North-East Corner Section 14 Town 2 South Range 9 East. In Wayne County, Illinois." The other stated that William Lines conveyed to Mary Lines "the undivided one half of the north half of the north we quarter of Section 14 Foreteen town two South Range 9 East. two acres of the South east corner of Section 14 Foreteen town 2 South Range 9 nine east. In Wayne County, Illinois." Mary Lines was the wife of William Lines, and Lizzie Merritt (who is now Lizzie Willey) and Hattie Lines (who is now Hattie Harvick) are two of their daughters. William Lines died August 9, 1909, leaving a will, whereby, after bequeathing various specific legacies to certain of his children and grandchildren, he divided the balance of his property into five portions: one to one of his sons, one to each of his three daughters, (including Mrs. Willey and Mrs. Harvick,) and one to the children of a deceased child. He appears to have left surviving two sons and three daughters and the grandchildren. The will authorized his executor, Charles Emmerson, to sell and convey the real and personal estate, and after paying the debts and specific legacies to divide the balance into five portions and distribute as provided by the will. His wife, Mary Lines, died in 1905, leaving a will, which gave all of her property, real and personal, to her daughter Lizzie Willey. The record does not show what property, if any, Mrs. Lines possessed at her death, except whatever interest she may have had in that eighty acres.

Appellees contend that these deeds conveyed the whole of the eighty-acre tract of bottom land, and, together with the will of Mary Lines, vested the title thereto in appellees Lizzie Willey and Hattie Harvick. Shortly before the original bill was filed in this case Mrs. Willey and Mrs. Harvick gave to B. F. Thomas, an attorney whom the record shows to have been at that time a partner of Thomas

H. Creighton, solicitor for the appellees, a deed to an undivided fourth interest in the eighty acres in question, and took from him a written agreement reciting that he would act as attorney and counsel in all suits to contest title to the land. Appellants contend that the evidence introduced requires the court of chancery to cancel and set aside these deeds as void, or, construed most favorably to appellees' interests, to reform said two deeds from Lines so as to hold that they conveyed two acres to Mary Lines and four acres to Lizzie Willey and Hattie Harvick in common.

The justice of the peace, George Stroup, who took the acknowledgment of the two Lines deeds, testified before the chancellor on this last hearing. It appears that he testified before the chancellor on the former hearing and that his testimony in the case was taken at one time before a notary public. He also signed a written statement on November 5, 1909, for attorney Thomas, one of the appellees. At this hearing in July, 1911, he stated that he would be seventy-eight years old the following month. About a year before the case was heard this last time he had a paralytic stroke, which he stated had affected his memory. His testimony on this hearing was to the effect that he had lived at Grayville, in White county, for the last three years but before that for twenty years had lived near Ellery, in Edwards county; that he had been justice of the peace for three terms and ran a mill within a short distance of Mr. Lines' home; that Mr. Lines came to him and told him there was to be an election for drainage officers, and as the candidate he favored lacked a few votes he (Lines) was going to make some, saying to the witness, "Come up; I want to make some deeds to the girls,—one for Lizzie, one for Hattie and one for Mary Lines;" that the witness went over and fixed the deeds up; that in about two or three weeks Mr. Lines came to him again and said, "You will have to do those things over,—the land is in the wrong district;" that shortly thereafter James Smerdon, then

working for Mr. Lines, took witness to Mr. Lines' house and he made the two deeds here in question; that before he made them he drew one incorrectly in the forenoon, which was destroyed, and he stayed to dinner and drew these afterwards; that Mr. Lines told him he wanted to give two acres to Lizzie, two acres to Hattie and two to Mrs. Lines; that the deed by which Lines obtained title to an undivided half of the eighty acres in question (called "the bottom eighty" in this record) was obtained from Judge Carroll C. Boggs in 1891; that the Boggs deed was brought out by Mrs. Lines and the first part of the description in each of the two deeds copied from it; that he intended, in writing these two deeds, to convey two acres to each of said three grantees; that upon witness stating that the description was somewhat indefinite, Mr. Lines said it did not make any difference,—the deeds were only to last until after the drainage election; that he (witness) had made a mistake in the date; that the year 1897 written in the deeds and acknowledgments should have been 1896; that he had discovered this mistake since he testified on the first hearing, by an examination of the drainage board record, which showed that the drainage election in question was in 1896; that he intended to date the deeds the day they were written, and did not know how he came to write the wrong year.

It appears that Mr. Stroup testified before the notary public that the deeds were intended to convey two acres to the wife and one acre to each of the daughters. In the written statement which he signed and gave Mr. Thomas the witness stated that he made the deeds to convey an undivided one-half interest in the eighty-acre tract to the wife, Mary Lines, and the other undivided one-half to Lizzie Merritt and Hattie Lines, for a consideration of one dollar for each deed, and that the deeds were delivered. On this trial he testified he did not know whether a dollar was paid or not; that he gave the deeds to Mrs. Lines or left them

on the table. The witness' statements at the various times he testified are not in entire harmony as to what he thought the deeds described, some of his testimony given at other times indicating that he thought the last part of the description was intended to convey land outside of the eighty acres in question.

James Smerdon testified that he was working for William Lines in 1896 and saw Mr. Stroup there drawing the deeds in March of that year; that he fixed the date by the drainage election; that he (witness) was feeding the stock when the justice came to the farm; that he heard Mr. Lines say to Mr. Stroup that he wanted to make some deeds to the women so they could vote at the election and beat Dan McCollom, and wanted to deed five acres apiece to his wife and each of the girls; that three deeds were prepared in the morning but described land outside of the drainage district; that witness was in the house until dinner time but did not remain there afterwards and did not hear the conversation about the second lot of deeds; that he took the girls and Mrs. Lines over to the drainage election in a wagon, and when they passed the bottom eighty the women folks laughingly pointed out where they owned the land, saying, "That is mine, over in that corner,"—one referring to the northeast corner and one to the south-east corner of the eighty; that in March, 1909, or thereabouts, he asked Mr. Lines to have Lizzie come and vote at an election where he (Smerdon) was running for commissioner in that district, and Mr. Lines said that she could not vote; that the deeds that Mr. Stroup made had been destroyed. The witness testified that Mr. Lines himself voted at the election.

J. M. Campbell stated that he had practiced law at Albion, Edwards county, forty-five years, and had been Mr. Lines' attorney during his lifetime and was the attorney of the executor up to the time this litigation started and was still acting for him in the probate court. He testified that shortly after Mr. Lines' death the appellee Lizzie Willey

brought him the two deeds in question and asked his opinion as to what to do with them; that she stated the deeds were made to enable her and her sister and mother to vote at the drainage election, and conveyed two acres to each of them; that he thought she said she had found them among her father's papers; that he told her he did not believe the deeds were of any account, or at least did not amount to enough to have a fuss over, but that he did not want to advise with her as a lawyer and thought she better consult her attorney, Mr. Strawn.

Jennie Goodman testified that Mrs. Willey told her the deeds had been made to get them to vote at a drainage election, and were no good, and J. D. McDermott testified that Mrs. Willey told him that if her father had only given her this bottom land she would be satisfied. There is other evidence that Mr. Lines said he was going to deed the land to his wife and daughters to enable them to vote at this drainage election. There is also testimony by other witnesses that Mr. Lines voted at many drainage elections in this district after 1896, and that he owned no other land in the district except this eighty acres. There is testimony, also, which tends to show that Mrs. Willey said that if the bottom tract did not bring more than $60 an acre when it was sold after her father's death she would buy it herself. The testimony of the executor shows that Mrs. Willey was talking in October, 1909, after her father's death, about renting the bottom eighty from the executor; that when they had almost come to terms she requested him to delay the matter for a few days so that she could secure legal advice as to certain deeds; that he had never heard of her claiming under these deeds before that. Henry Ramsay said that he had negotiated with the executor as to Mrs. Willey's renting the eighty, and one day, while visiting her, he asked if she did not have some deeds to this land, and she said yes and showed them to him, and he told her she better get the advice of a lawyer with reference to them.

The evidence seems to show, without contradiction, that Mr. Lines rented out this land and paid the taxes on it from 1896 until about the time of his death, and that the executor sold what was raised on it the year Mr. Lines died, without objection on the part of Mrs. Willey or Mrs. Harvick. The evidence also shows that since 1909 appellees have had possession and worked and paid the taxes on said eighty acres.

The year before his death Mr. Lines had working for him a boy named Gumble. This boy's sister was living with Mr. and Mrs. Hinkle, at Fairfield. They both testified that they went over to visit Mr. Lines the Christmas before he died, and he told them he had deeded the eighty-acre tract to his two daughters. Charles Curtis, an uncle of the Gumble youth, testified that Mr. Lines told him several times that the bottom land belonged to his daughters. Mrs. Elizabeth Walters, who had lived for years a near neighbor to the Lines, testified that in March before Mr. Lines died she was at the house and he was hunting for a certain mortgage and note, and Lizzie found them in her trunk, along with the deeds here in question; that he told Lizzie to put the deeds to the bottom land away, as she might need them; that Mr. Lines was at her house three weeks before he died, and again told her he had deeded the bottom land to his daughters, Hattie and Lizzie. The daughter Lizzie appears to have lived with and taken care of her parents for a number of years before her mother's death, and after Mrs. Lines died kept house for her father until he died. The daughter Hattie stayed with her parents for some time during her widowhood, before she remarried. She did not testify on the last trial. An affidavit was presented asking a continuance on account of her absence. In order to avoid a continuance appellants agreed to admit her evidence taken on the former trial. She testified at that time that she visited attorney Campbell's office, in Albion, with her sister, and that when they asked what

they should do with the deeds he told them to burn them,—that they were no good; that he also advised them to see another lawyer. Appellee Lizzie Willey testified to the same effect as to their conversation with attorney Campbell. Mrs. Willey also denied the testimony given by Jennie Goodman and John McDermott. One witness testified on this last hearing that Mrs. Harvick had told him since the first trial that she was tired of this litigation and was not going to have any more to do with it; that her father never intended the daughters to have the land but simply made the deed to let them vote at a drainage election. The two daughters, appellees here, could only testify as to facts occurring after their father's death. The husband of Mrs. Willey was therefore an incompetent witness as to conversations he had had with Mr. Lines. *Heintz v. Dennis,* 216 Ill. 487.

We think it is clear from the testimony in this record that Mr. Lines did attempt to make some deeds to some of this bottom land so that his wife and daughters could vote at a drainage election in 1896. Whether these two deeds in question are the deeds that he made that year, on the testimony given, may well be questioned. The testimony of Mr. Stroup, the justice of the peace, given at various times, does not harmonize. Why he should have dated the deeds a year in advance is not apparent. From his testimony at these various times, given fourteen or fifteen years after the transactions occurred, it is evident that he is not clear as to what he did or why he did it. He did not attempt to explain the statement that he gave to appellee Thomas, except to say that he did not read it but it was read to him by Mr. Thomas. He did not claim that it was not read correctly. His testimony and Smerdon's differ in many of the material details as to what took place at the time the deeds were drawn. The other evidence as to these deeds is clearly conflicting and irreconcilable. It is argued by counsel for appellees that it might be harmonized by hold-

ing that the first set of deeds were drawn for the drainage election and that the deeds here in question were drawn after that contest. We are unable, however, to harmonize all the evidence in this record even on that assumption.

Appellants contend that the deeds were not delivered by Mr. Lines to his wife and daughters. The testimony introduced by appellants themselves is inconsistent with that contention, as well as that introduced by appellees. These deeds, duly executed, were found in the hands of the grantees, and there is a strong implication, therefore, that they were delivered, which can only be overcome by convincing evidence. (*Blake* v. *Ogden,* 223 Ill. 204; *Inman* v. *Swearingen,* 198 id. 437; *Potter* v. *Barringer,* 236 id. 224.) In cases of voluntary settlements the presumption in favor of the delivery of deeds is greater than in ordinary cases of bargain and sale. (*Thompson* v. *Calhoun,* 216 Ill. 161; *Latimer* v. *Latimer,* 174 id. 418; *Ward* v. *Conklin,* 232 id. 553.) The fact that the grantor retained possession of the property and received the rents during his lifetime, if the deeds were actually delivered, could not re-invest him with title. (*Potter* v. *Barringer, supra; Ward* v. *Conklin, supra.*) The usual rule is, that where there is a written agreement the whole sense of the parties is presumed to be comprised therein. (I Story's Eq. Jur.—12th ed.—sec. 153.) Such instrument will not be changed unless fraud, accident or mistake can be established by the strongest and most convincing evidence. (*Hunter* v. *Bilyeu,* 30 Ill. 228; *Carson* v. *Davis,* 171 id. 497; *Stanley* v. *Marshall,* 206 id. 20; *Koch* v. *Streuter,* 218 id. 546.) If the mistake is conceded by both sides or proved by satisfactory evidence equivalent to an admission, courts of equity will not hesitate to reform a deed. The rule, however, forbids relief whenever "the evidence is loose, equivocal or contradictory, or is in its texture open to doubt or opposing presumptions. The proof must be such as will strike all minds alike as being unquestionable and free from reasonable doubt."

253—29

(1 Story's Eq. Jur.—12th ed.—sec. 157.) The authorities all agree that parol evidence of the mistake and the alleged modification must be of such a nature that the resulting proof "must be established beyond a reasonable doubt. Courts of equity do not grant the high remedy of reformation upon a probability nor upon a mere preponderance of evidence, but only upon a certainty of the error." (2 Pomeroy's Eq. Jur.—3d ed.—sec. 859.) The authorities cited (including decisions of this court) by both of the learned authors just quoted fully sustain the conclusions they have reached.

The first part of the description in the deeds conveyed, without question, the entire eighty-acre tract to the wife and two daughters of Mr. Lines. The evidence offered to reform this description by parol testimony is, to say the least, loose and open to doubt or opposing presumptions. Taking the whole record together, it cannot be said that the proof is such that it will strike all minds alike as "unquestionable and free from reasonable doubt."

The six acres alleged by the bill to have been conveyed (instead of the entire eighty) by these deeds cannot be definitely located, either from that part of the description relied upon in the deeds or from any other evidence in the record. The second part of the description of the first deed attempts to convey four acres in the north-east corner of section 14, and the second part of the description in the second deed attempted to convey two acres in the south-east corner of said section 14. The record shows that testator did not own any land either in the north-east or south-east quarter of said section 14. The only parol evidence in the record attempting to locate by pointing out this property is the laughing remarks of the two daughters and their mother when they were driving to the drainage election. Manifestly, however, the witness who testified to these remarks did not attempt by his testimony to locate either of the pieces.

There is a further reason why it is impossible, under the law, to have these deeds either set aside or reformed, as prayed for in the bill. The law will not permit a party to convey his property for an unlawful purpose, and then, through the intervention of a court of equity, regain the same after the unlawful purpose has been accomplished. The law will leave him where he has placed himself. This rule applies not only to the grantor but to those in privity with him. If the allegations of the bill are true, the testator, William Lines, conveyed this property to his wife and daughters solely for the purpose of permitting them to vote at a drainage election. They could not vote legally at such election unless they actually owned the land. Neither he nor his heirs can come into a court of equity and have these deeds set aside or corrected on such a state of facts. *Jolly* v. *Graham*, 222 Ill. 550; *Decker* v. *Stansberry*, 249 id. 487. See, also, *Cosby* v. *Barnes*, 251 Ill. 460.

The chancellor saw the witnesses and heard them testify. He was in much better position to determine their credibility than is this court. The weight of the testimony is for the trial court, and a court of review will not reverse the findings of a chancellor unless, from all the evidence, it is clear that palpable error has been committed. (*Zimmerman* v. *Zimmerman*, 242 Ill. 552; *Klussman* v. *Wessling*, 238 id. 568.) Two chancellors at different times heard practically the same evidence in this case and in each instance dismissed the bill for want of equity.

In view of the rules of law governing the reformation of written instruments and the weight that should be given to the chancellor's findings, we are not disposed to disturb the decree, and it will accordingly be affirmed.

*Decree affirmed.*