*In re* ESTATE OF JAMES M. RAGEN, JR., Deceased.—(RAY-CHUEN CHANG, a Minor, by Yu-Wei Chang, her Mother and Next Friend, Petitioners-Appellees, *v.* VIRGINIA E. RAGEN *et al.*, Respondents-Appellants.—(THE PEOPLE *ex rel.* WILLIAM J. SCOTT, Attorney General, Intervenor).)

First District (5th Division)   No. 78-1152

Opinion filed November 30, 1979.

Donald E. Egan, Francis X. Grossi, Jr., and Lee Ann Watson, all of Katten, Muchin, Gitles, Zavis, Pearl & Gallier, of Chicago, for appellants.

Allan N. Lasky, Norman E. Goldman, and George L. Grumley, all of Spivack & Lasky, of Chicago, for appellees.

Mr. JUSTICE MEJDA delivered the opinion of the court:

Respondents, the co-executors and legatees of the estate of James M. Ragen, Jr., appeal from an order of the circuit court of Cook County which amended heirship in Ragen's estate to include petitioner, Ray-Chuen Chang, as the daughter of Ragen and co-petitioner, Yu-Wei Chang. On appeal, respondents contend that: (1) the trial court applied the wrong standard of proof in weighing the evidence; (2) the testimony of Ragen's former attorney was improperly allowed; and (3) the trial court erred in refusing to direct petitioners to submit to blood tests. We reverse and remand. The pertinent facts follow.

Ragen had been married once in his lifetime, the marriage ending in divorce after 17 years and two children. Ragen traveled extensively and had frequently lived abroad. He died in a hospital in Singapore in October 1973 and left a will which was admitted to probate in Cook County on September 17, 1974. Ragen left the major portion of his estate to fund a charitable trust established in the will and made smaller bequests to his brothers and sisters. The will made no mention of any children.

In their petition to amend heirship, petitioners alleged, *inter alia*, that Ragen and Yu-Wei Chang had entered into a common law marriage in Taipei, Taiwan, which resulted in the birth of Ray-Chuen Chang on September 28, 1969. Petitioners further alleged that Ragen had repeatedly acknowledged Ray-Chuen as his daughter, and that acknowledgment had been memorialized in certain decrees of the Taipei District Court and the Taiwan High Court.

Stephen Chang, an attorney who had represented Ragen in Taiwan, testified for petitioners. Chang is licensed to practice law in Taiwan and in Washington, D. C., and had first met Ragen in the early 1960's, when Ragen was referred to Chang's firm in Taiwan. Chang was allowed to testify, over respondent's objections, to matters pertaining to his representation of Ragen in an action in which Ragen sought custody of Ray-Chuen. Acknowledgment or proof of paternity is a prerequisite to the granting of custody in Taiwan, and a letter was admitted into evidence in which Ragen acknowledged Ray-Chuen as his daughter and

directed Chang to seek custody on his behalf. The letter was handwritten by Chang and signed by Ragen. Ragen lost the custody case at the trial level and he and Yu-Wei Chang settled the matter on appeal. The documents from the Taiwan courts were also admitted into evidence. Chang further testified that, in accordance with Chinese law, Yu-Wei had appointed him guardian of Ray-Chuen in the heirship proceedings and that Chang's Washington, D. C., law firm was co-counsel for petitioners in the instant case.

During 1969, prior to Ray-Chuen's birth, Chang had frequently visited Ragen's home during the day, and Yu-Wei was present at each visit. Chang also testified that, after Ray-Chuen's birth in September 1969, Ragen often referred to her as his daughter. Yu-Wei did not live with Ragen between 1971 and 1972. In 1974, after Ragen's death, Chang had received a cable from an attorney for Ragen's estate asking that Chang send him a certified copy of the household registration from the Taiwanese census bureau. Ragen was not shown as Ray-Chuen's father on the registration, and Chang sent an associate to record Ragen's paternity on the registration. The household registration was admitted into evidence and shows that Ragen's name was added on July 17, 1974, and states that Ragen had acknowledged Ray-Chuen in Taiwanese court proceedings. The amended household registration was then sent to the attorney for Ragen's estate.

Yu-Wei Chang testified through an interpreter that she is Ray-Chuen's mother and currently lives in Tokyo, Japan, with her husband while Ray-Chuen lives in Taiwan with Yu-Wei's mother. Yu-Wei and Ragen were living together when Ray-Chuen was born and Yu-Wei had no sexual relations with anyone else while she and Ragen lived together. Yu-Wei had met Ragen in 1967 in the living room of his hotel suite at the Taiwan Hotel. Yu-Wei had never been to the hotel before and was with friends when they went to visit Ragen. Yu-Wei was 20 years old at the time and was unemployed and living with her parents. She and Ragen began living together several weeks after they met.

Yu-Wei's mother lived with her and Ragen at the time of Ray-Chuen's birth in 1969. When Ray-Chuen was born, Ragen visited her at the hospital and paid all of the hospital and medical bills. Ray-Chuen's birth certificate, which was admitted into evidence, did not contain the name of her father. Yu-Wei testified that she did nothing regarding Ray-Chuen's birth record and that her mother had provided the information for it. According to Yu-Wei, her mother knew that Ragen was Ray-Chuen's father and lived with the three of them until Yu-Wei moved out of Ragen's house in September or October of 1971. Yu-Wei returned to Ragen around Christmas in 1972, and they lived together until Ragen went to Singapore in August 1973.

The discovery deposition of Virginia E. Ragen, Ragen's sister and a co-executor of his estate, was allowed as evidence. In it, Ms. Ragen stated that Ragen had mentioned that Ray-Chuen was his daughter.

Stephen Chang was called as the first witness for respondents and testified that his Taiwan office had begun representing Yu-Wei in 1977. A letter from Chang to Ragen was admitted into evidence in which Chang referred to proceedings to change Ray-Chuen's name, but Chang admitted that Ragen had never asked him to begin such proceedings and that he was merely acting pursuant to the acknowledgment and settlement in the Taiwan custody action. In that action Ragen had also offered Yu-Wei $2500 to release her claim on the house in which they lived. Chang also testified that he never discussed a will with Ragen.

Chang testified at some length regarding Taiwanese household registration procedures in general and Yu-Wei's registrations in particular. The household registrations indicated that Yu-Wei had "moved out to" Ragen's address from her family's home on April 19, 1971, but Chang stated that the date reflects the date of recording rather than the date of the actual move. The registrations showed Yu-Wei as head of the household and Ray-Chuen as her daughter but made no mention of Ragen, either as Ray-Chuen's father or as a member of the household. Chang explained that Ragen, as an alien, could not be shown as a member of the household but that his name could appear elsewhere in the registration document. Because Ray-Chuen's birth certificate was the basis for her inclusion in the registration, if the name of her father hadn't appeared on the birth certificate it would not appear in the household registration. Chang explained further that anyone may file information in a household registration and the information therefore may not be correct. He also added that not all entries on the registrations are dated.

Respondents also called Yu-Wei to testify regarding the household registrations. She stated that she did not know who had provided all of the information for them, but that her mother had taken care of some of it and that she herself had given other information to a policeman.

Robert Ragen, a brother of the decedent, testified that he last saw his brother in the hospital in Singapore in October 1973. Robert Ragen had arrived there in September and stayed for 18 days, until his brother's death, during which time he visited Ragen 12 to 14 hours each day. In the course of those visits, the decedent had told his brother of Yu-Wei and Ray-Chuen. He did not claim Ray-Chuen as his daughter, however, but had merely stated that he had befriended Yu-Wei's daughter.

Dr. Joseph Tanous, who had known Ragen since 1948 and had lived with him in France for 10 years, testified that he arrived in Singapore on September 15, 1973, and visited Ragen frequently until Ragen's death the following month. Ragen conducted business from his hospital bed and

mentioned many other personal matters. Ragen had detailed discussions with Dr. Tanous about both his will and Ray-Chuen. Ragen had told Dr. Tanous that the house in Taiwan was for Ray-Chuen and that, although Ray-Chuen was not his daughter, he had sought custody because he considered her mother to be unfit. Dr. Tanous also stated that in saying that Ray-Chuen was not his daughter, Ragen had recalled the opinion received from a doctor in Paris while Ragen and Dr. Tanous lived there, that Ragen could have no more children. Dr. Tanous also testified that Robert Ragen had arrived in Singapore after him and that Robert Ragen did not spend extended periods of time visiting his brother in the hospital.

The trial court initially entered an order on April 7, 1978, finding that petitioners had proved "by a preponderance of evidence, which is clear and convincing [*sic*]," that Ragen was Ray-Chuen's father and amending heirship in the estate to include Ray-Chuen. The order was amended on April 10, 1978, omitting the stricken "clear and convincing" language entirely. It is from the latter order that respondents appeal.

OPINION

Respondents first contend that the trial court applied the wrong standard of proof in finding that Ragen's paternity had been proved by a preponderance of the evidence.

This action was brought following the decision of the United States Supreme Court in *Trimble v. Gordon* (1977), 430 U.S. 762, 52 L. Ed. 2d 31, 97 S. Ct. 1459, which held that section 12 of the Illinois Probate Act of 1939 (Ill. Rev. Stat. 1973, ch. 3, par. 12)[1] was unconstitutional because it allowed illegitimate children to inherit by intestate succession only from their mothers. After *Trimble*, the legislature enacted Public Act 80-1429, effective September 12, 1978, which amended section 2—2 of the Probate Act of 1975 to read, in pertinent part:

> "* * * If a decedent has acknowledged paternity of an illegitimate person or if during his lifetime or after his death a decedent has been adjudged to be the father of an illegitimate person, that person is heir of his father and of any paternal ancestor and of any person from whom his father might have inherited, if living; * * *. If during his lifetime the decedent was adjudged to be the father of an illegitimate person by a court of competent jurisdiction, an

---

[1] The Probate Act of 1939 was formerly included in Ill. Rev. Stat. ch. 3, pars. 1 through 346. It was repealed, effective January 1, 1976, by P.A. 79-328, which simultaneously enacted the Probate Act of 1975. The new Act was included in Ill. Rev. Stat. 1975, ch. 3, pars. 1—1 *et seq.*, and was later transferred to Ill. Rev. Stat. 1977, ch. 110½. The subject matter of the unconstitutional section 12 of the 1939 Act is now found in Ill. Rev. Stat. 1977, ch. 110½, par. 2—2 and all further references to the Probate Act in this opinion shall be to the Act of 1975, with numbering as it currently appears in the Illinois Revised Statutes.

authenticated copy of the judgment is sufficient proof of the paternity; but in all other cases paternity must be proved by clear and convincing evidence. * * *.

Section 2. This amendatory Act takes effect upon its becoming a law and applies to the estates of decedents dying before, on or after its effective date."

The parties agree that the clear and convincing standard of proof required by Public Act 80-1429 applies to the instant case, although the amendment was enacted after the final order had been entered in the trial court. Public Act 80-1429 specifically includes estates of decedents who had died before the date of its enactment. (Ill. Rev. Stat., 1978 Supp., ch. 110½, par. 2—2.) Furthermore, the standard of Public Act 80-1429 is the same standard which was applied in *Morelli v. Battelli* (1979), 68 Ill. App. 3d 410, 386 N.E.2d 328, and *In re Estate of Larimore* (1978), 64 Ill. App. 3d 470, 381 N.E.2d 76, two similar cases which also arose between the decision of *Trimble* and the enactment of Public Act 80-1429.

We note that, although documents from the Taiwanese courts stating that Ragen acknowledged Ray-Chuen as his child were admitted into evidence, the issue before the courts in Taiwan was that of custody rather than paternity and there has therefore been no adjudication of paternity during Ragen's lifetime. Accordingly, petitioners may prevail only if they have proved Ragen's paternity by clear and convincing evidence. While petitioners contend that they have done so, the record indicates that the proper standard was not applied.

The final order, entered April 10, 1978, included the following finding:

"3) The Petitioners have proven by a preponderance of evidence that the Petitioner, RAY-CHUEN CHANG, is the daughter of the deceased, JAMES M. RAGEN, JR."

Proof by a preponderance of the evidence is not the same as proof by clear and convincing evidence. The preponderance of the evidence has been defined as evidence sufficient to incline an impartial and reasonable mind to one side of an issue rather than the other. (*Moss-American, Inc. v. Fair Employment Practices Commission* (1974), 22 Ill. App. 3d 248, 259, 317 N.E.2d 343, 351.) A proposition proved by a preponderance of the evidence is one that has been found to be more probably true than not. (See generally Illinois Pattern Jury Instructions, Civil, Nos. 21.00 and 21.01 (2d ed. 1971).) Clear and convincing evidence, on the other hand, reflects a more exacting standard of proof.

While it has been defined as evidence which leaves the mind well satisfied of the truth of a proposition (*Hotze v. Schlanser* (1951), 410 Ill. 265, 102 N.E.2d 131; *Finney v. White* (1945), 389 Ill. 374, 59 N.E.2d 859), strikes all minds alike as being unquestionable (*Lines v. Willey* (1912), 253

Ill. 440, 97 N.E. 843), or leads to but one conclusion (*Johnson v. Johnson* (1953), 1 Ill. 2d 319, 115 N.E.2d 617), proof by clear and convincing evidence has most often been defined as the quantum of proof which leaves no reasonable doubt in the mind of the trier of fact as to the truth of the proposition in question (*Galapeaux v. Orviller* (1954), 4 Ill. 2d 442, 123 N.E.2d 321; *Morelli v. Battelli*). It is apparent, however, that, although stated in terms of reasonable doubt, clear and convincing evidence is considered to be more than a preponderance while not quite approaching the degree of proof necessary to convict a person of a criminal offense. (*People v. Ralls* (1974), 23 Ill. App. 3d 96, 318 N.E.2d 703; *People v. Sansone* (1974), 18 Ill. App. 3d 315, 309 N.E.2d 733; see also 30 Am. Jur. 2d *Evidence* §1167 (1967).) The spectrum of increasing degrees of proof, from preponderance of the evidence, to clear and convincing evidence, to beyond a reasonable doubt, is widely recognized, and it has been suggested that the standard of proof required would be clearer if the degrees of proof were defined, respectively, as probably true, highly probably true and almost certainly true. McBaine, *Burden of Proof: Degrees of Belief*, 32 Calif. L. Rev. 242 (1944).

██ The final order clearly states that the finding of paternity is based on a preponderance of the evidence, the minimal standard, rather than the much stricter standard of proof by clear and convincing evidence. We therefore cannot accept petitioners' contention that there was nonetheless clear and convincing proof of Ragen's paternity, for to do so would necessitate either that we read into the final order a standard which was specifically deleted by the trial court or that we reweigh the evidence in the light of the higher standard. This we will not do. We conclude that the final order of the trial court is incorrect as a matter of law and the cause should be reversed and remanded for such further proceedings as may be necessary to allow the application of the proper evidentiary standard.

Respondents next contend that Stephen Chang should not have been allowed to testify, maintaining that the subject of his testimony was a privileged communication and that he was incompetent to testify because of a conflict of interest.

██ The attorney-client privilege protects secret and confidential communications between attorneys and their clients for the purpose of promoting freedom of communication between them. (*Taylor v. Taylor* (1977), 45 Ill. App. 3d 352, 359 N.E.2d 820.) Chang testified that Ragen had told him that Ray-Chuen was Ragen's daughter and instructed Chang to initiate custody proceedings on his behalf. Chang's testimony laid the foundation for the admission into evidence of Ragen's letter to Chang telling him to seek custody of Ray-Chuen as well as copies of the documents from the courts of Taiwan in which Ragen alleged and agreed that he was Ray-Chuen's father. Ragen's communication to Chang cannot

be considered secret or confidential, for Ragen clearly spoke to Chang with the intention that Chang would then make Ragen's claim to Ray-Chuen part of a public record so that Ragen could gain custody of her. A communication for purposes of disclosure is not privileged. (See *Monier v. Chamberlain* (1966), 66 Ill. App. 2d 472, 486, 213 N.E.2d 425, 433, *aff'd* (1966), 35 Ill. 2d 351, 221 N.E.2d 410.) Chang's other testimony consisted only of observations, not communications, made when he visited Ragen's home. Consequently, Chang's testimony was not barred by virtue of the attorney-client privilege.

Furthermore, we do not agree with respondents' contention that Chang's testimony presents a conflict of interest. Respondents rely upon *In re Williams* (1974), 57 Ill. 2d 63, 309 N.E.2d 579, in which an attorney was censured for representing conflicting interests in violation of Canon 6 of the Canons of Professional Ethics. In *Williams*, the attorney had represented the husband in a divorce action. Pursuant to the divorce decree, the attorney had obtained the signature of his client's ex-wife on an affidavit so that the client could remove her as a beneficiary under a life insurance policy but the client died before the affidavit was delivered to the insurance company. The attorney was retained to represent his deceased client's estate, but was dismissed the following day by the administrator. Subsequently, he was retained by the decedent's ex-wife to represent her in attempting to collect the proceeds of the insurance policy.

The supreme court held that the attorney had represented conflicting interests, noting that an attorney's duty of loyalty does not end with his client's death and that an attorney is not free to represent adverse interests after his discharge. The conflict arose, the court stated, because the attorney sought to collect proceeds of the insurance policies for the ex-wife after having tried to remove her as a beneficiary of those same policies for his deceased client.

The instant case is distinguishable. Chang had represented Ragen in Ragen's attempts to obtain custody of Ray-Chuen. In representing Ray-Chuen and her mother in seeking to have Ray-Chuen declared Ragen's heir, Chang was pursuing an interest consistent with Ragen's in the custody case. The attempts at custody necessitated, in the Taiwanese courts, Ragen's acknowledgment of Ray-Chuen as his child. The benefits of a successful custody action would have included Ray-Chuen's having rights as an heir to Ragen, the same thing which Ray-Chuen now seeks directly. There is therefore no conflict.

■ Respondents also maintain that Chang's testimony was explicitly prohibited under Canon 5 and Disciplinary Rule 5—102 of the Illinois Code of Professional Responsibility. However, the Code of Professional Responsibility is not binding on the court (*In re Taylor* (1977), 66 Ill. 2d

567, 363 N.E.2d 845), although it does reflect the reluctance of the courts to permit an attorney to testify in favor of his client. (See R. Hunter, Trial Handbook for Illinois Lawyers §3.9 (4th ed. 1972).) The Code provides a guide for professional conduct, and an attorney may be subject to disciplinary proceedings for failure to follow it (*In re Krasner* (1965), 32 Ill. 2d 121, 204 N.E.2d 10), but we cannot say that it imposes a rule of evidence. It is well established that an attorney is not incompetent to testify (see, *e.g., People v. Gendron* (1968), 41 Ill. 2d 351, 243 N.E.2d 208, *cert. denied* (1969), 396 U.S. 889, 24 L. Ed. 2d 164, 90 S. Ct. 179; *People v. Attaway* (1976), 41 Ill. App. 3d 837, 354 N.E.2d 448), and under the circumstances of this case we find that there was no error in allowing him to do so.

Finally, respondents contend that the denial of their request to order petitioners to submit to blood tests was improper. The motion for blood tests is actually part of the discovery proceedings where paternity is in issue, and is therefore governed by Supreme Court Rule 215. (Ill. Rev. Stat. 1977, ch. 110A, par. 215; *Zavaleta v. Zavaleta* (1976), 43 Ill. App. 3d 1017, 358 N.E.2d 13.) The trial court has broad discretion in considering a motion under Rule 215. (*Jackson v. Whittinghill* (1963), 39 Ill. App. 2d 315, 188 N.E.2d 337.) Rule 215 provides for the motion to be made "within a reasonable time before the trial," and a motion made on the first day of trial has been found to be untimely. (*Crown v. Village of Elmwood Park* (1969), 118 Ill. App. 2d 278, 255 N.E.2d 47.) In the instant case, the motion for blood tests was made the day before the trial was scheduled to begin and we find no abuse of discretion in the trial court's denial of the motion at that time. Nevertheless, we agree with the court in *Zavaleta* that the blood type of the mother and child is of great importance in a case in which paternity is in issue and we in no way intend to prejudice respondents' right to resubmit the motion to the trial court on remand.

For the foregoing reasons, the judgment of the trial court is reversed and the cause remanded for further proceedings not inconsistent with this opinion.

Reversed and remanded.

SULLIVAN, P. J., and WILSON, J., concur.